Case 3:03-cv-00333-M   Document 1-2   Filed 02/14/03   Page 1 of 20   PageID 1

ORIGINAL

U.S. DISTRICT COURT
NORTHERN DISTRICT OF TEXAS
FILED

FEB 14 2003

CLERK, U.S. DISTRICT COURT
By_____
    Deputy

IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF TEXAS
DALLAS DIVISION

| | | |
|---|---|---|
| RONALD A. YOUNG | § | CIVIL ACTION NO. |
| | § | |
| Plaintiff, | § | **PLAINTIFF DEMANDS A JURY TRIAL** |
| | § | |
| V. | § | |
| | § | |
| JOHN F. ANTIOCO, PHILIPPE P. DAUMAN, | § | |
| RICHARD J. BRESSLER, MEL KARMAZIN, | § | |
| SUMNER M. REDSTONE, DEAN W. | § | 3-03CV0333-L |
| WILSON, NIGEL TRAVIS, JIM | § | |
| NOTARNICOLA, EDWARD B. STEAD, | § | |
| MIKE ROEMER, NICK SHEPHERD, | § | |
| CHRIS WYATT, AND LARRY ZINE, | § | |
| | § | |
| Defendants | § | |
| | § | |
| V. | § | |
| | § | |
| BLOCKBUSTER, INC., | § | |
| | § | |
| Nominal Defendant. | § | |

## PLAINTIFF'S ORIGINAL COMPLAINT

NOW COMES, Ronald A. Young, hereinafter referred to as "Plaintiff," and alleges the following for his Complaint based upon information and belief, except for those matters which concern Plaintiff and his own acts, which are alleged upon personal knowledge:

### NATURE OF THE ACTION

1. This is a shareholder's derivative action brought on behalf of nominal defendant Blockbuster Inc. ("Blockbuster" or the "Company") against certain officers and directors of the Company as a result of the effectuation *inter alia* of a scheme to defraud the public shareholders of the Company, the revelation of which has resulted in legal action taken against the Company alleging violations of the securities laws. As a result of these defendants' wrongdoing, the Company has been

materially damaged, and plaintiff seeks redress for the injuries suffered by the Company.

2. On December 18, 2002, Blockbuster shocked the financial markets by announcing it had drastically lowered earnings estimates and growth rates. Defendants had previously misrepresented the Company's future financial prospects as highly positive, when the defendants knew that the Company's rental revenues from DVD's were disappointing, since many consumers had chosen to purchase them rather than rent them. Defendants also failed to disclose that the Company was in a material dispute with leading a subsidiary of The Walt Disney Co., Buena Vista Home Entertainment ( "BVHE"), wherein Blockbuster was accused by BVHE of breaching the terms of its revenue sharing agreement. BVHE thereafter brought suit against Blockbuster for $120 million alleging breach of contract.

3. Between February 12, 2002, and December 17, 2002, (the "Relevant Period"), insiders sold nearly $50 million worth of their Blockbuster shares to the investing public. Upon revelation of the wrongdoing Blockbuster shares have tumbled over 25 percent in value and the Company and a number of its officers and directors have been named as defendants in class action securities fraud lawsuits asserting that Blockbuster and the individual defendants defrauded the market in Blockbuster shares. As a result of the wrongdoing by the individual defendants, the Company now faces potentially ruinous liability, for which the individual defendants are liable to the Company as a result of their breaches of fiduciary duty.

## JURISDICTION AND VENUE

4. This Court has jurisdiction over the subject matter of this action pursuant to Section 27 of the Exchange Act, 15 U.S.C. §78aa and pursuant to 28 U.S.C. §§1331 and 1337. The claims

asserted herein arise under and pursuant to Sections 10(b) and 20(a) of the Exchange Act and present federal questions.

5. Venue is proper in this judicial district pursuant to Section 27 of the Exchange Act and pursuant to 28 U.S.C. §1391(b). At all times relevant to the complaint, the Company maintained its principal executive offices in this judicial district. In addition, a substantial number of the false and misleading statements complained of were prepared and disseminated to the investing public from offices within this district.

6. In connection with the violations of law alleged herein, the defendants used the means and instrumentalities of interstate commerce including the United States mail, interstate wire and telephone facilities, the facilities of the national securities markets and the Internet to distribute the false and misleading statements complained of herein.

7. This Court also has jurisdiction over the subject matter of this action pursuant to 28 U.S.C. §§1332 (diversity jurisdiction).

8. The defendants are citizens of Texas, New York or Delaware, and plaintiff is a citizen of a state other than Texas, New York and Delaware. The amount in controversy exceeds $75,000, computed without regard to any setoff or counterclaim to which defendants may be adjudged to be entitled, and exclusive of interests and costs.

### PARTIES

9. Plaintiff Ronald A. Young is a holder of Blockbuster common stock, and has held such stock at all times relevant to this Complaint.

10. Defendant Blockbuster, a Delaware corporation has its main offices at 1201 Elm Street, Dallas, Texas. It is a publicly traded subsidiary of Viacom Inc. and is the world's leading

renter of videos, DVDs, and video games, with more than 8,000 stores throughout the Americas, Europe, Asia and Australia. Viacom is a leading global media company, with preeminent positions in broadcast and cable television, radio, outdoor advertising, and online.

11.  Defendant John F. Antioco ("Antioco") is Chairman of the Board of Directors and Chief Executive Officer. During the Relevant Period, Antioco realized proceeds of approximately $19.5 million from selling Company stock.

12.  Defendant Philippe P. Dauman ("Dauman") is a member of the Company's Board of Directors. Dauman has served as a director on the Board of Directors of Viacom, Inc. since 1987, and is a former executive officer of Viacom.

13.  Defendant Richard J. Bressler ("Bressler") is a member of the Company's Board of Directors. Bressler has served as Senior Executive Vice President and Chief Financial Officer of Viacom Inc. since 2001.

14.  Defendant Mel Karmazin ("Karmazin") is a member of the Company's Board of Directors, and is President and Chief Operating Officer of Viacom.

15.  Defendant Sumner M. Redstone ("Redstone") is a member of the Company's Board of Directors. Redstone has been a director of Viacom Inc. since 1986 and Chairman of the Board of Viacom Inc. since 1987 and became Chief Executive Officer of Viacom Inc. in 1996.

16.  Defendant Dean W. Wilson ("Wilson") is Executive Vice President of the Company. During the Relevant Period, Wilson realized proceeds of approximately $4.9 million from selling Company stock.

17.  Defendant Nigel Travis ("Travis") is President and Chief Operating Officer of the Company. During the Relevant Period, Travis realized proceeds of approximately $2.4 million from

selling Company stock.

18. Defendant Jim Notarnicola ("Notarnicola") is Executive Vice President and Chief Marketing Officer of the Company. During the Relevant Period, Notarnicola realized proceeds of approximately $5 million from selling Company stock.

19. Defendant Edward B. Stead ("Stead") is Executive Vice President, General Counsel, and Executive Vice President Business Development of the Company. During the Relevant Period, Stead realized proceeds of approximately $7.7 million from selling Company stock.

20. Defendant Mike Roemer ("Roemer") is Executive Vice President and Chief Operations Officer, North America of the Company. During the Relevant Period, Roemer realized proceeds of approximately $3.1 million from selling Company stock.

21. Defendant Nick Shepherd ("Shepherd") is Executive Vice President, Merchandising and Chief Concept Officer of the Company. During the Relevant Period, Shepherd realized proceeds of approximately $200,000.00 from selling Company stock.

22. Defendant Chris Wyatt ("Wyatt") is Executive Vice President and President, International of the Company. During the Relevant Period, Wyatt realized proceeds of approximately $500,000.00 from selling Company stock.

23. Defendant Larry Zine ("Zine") is Executive Vice President, Chief Financial Officer and Chief Administrative Officer of the Company. During the Relevant Period, Zine realized proceeds of approximately $5 million from selling Company stock.

**DUTIES OF THE INDIVIDUAL DEFENDANTS**

24. By reason of their positions as officers, directors, and/or fiduciaries of the Company and because of their ability to control the business and corporate affairs of the Company, the

Individual Defendants owed the Company and its shareholders the fiduciary obligations of good faith, trust, loyalty, and due care, and were and are required to use their utmost ability to control and manage the Company in a fair, just, honest, and equitable manner. The Individual Defendants were and are required to act in furtherance of the best interests of the Company and its shareholders so as to benefit all shareholders equally and not in furtherance of their personal interest or benefit. Each director and officer of the Company owes to the Company and its shareholders the fiduciary duty to exercise good faith and diligence in the administration of the affairs of the Company and in the use and preservation of its property and assets, and the highest obligations of fair dealing.

25.  The individual defendants, because of their positions of control and authority as directors and/or officers of the Company, were able to and did, directly and/or indirectly, exercise control over the wrongful acts complained of herein, as well as the contents of the various public statements issued by the Company.

## SUBSTANTIVE ALLEGATIONS

26.  On December 18, 2002, The Company publicly announced:

> Blockbuster Inc. (NYSE: BBI) today announced updated guidance for the fourth quarter and full year 2002, based on lower than anticipated results to date in the fourth quarter.
>
> For the fourth quarter of 2002, the Company expects high single digit same store revenue percentage increases and low single digit gross profit dollar percentage increases. Blockbuster expects full year 2002 revenues to exceed $5.5 billion, resulting in gross profit dollar percentage increases in the low-single digit range and earnings per share of $1.03 to $1.10.
>
> Blockbuster had expected that fourth quarter same store revenue percentage increases would be in the low to mid-teen range, with

> gross profit dollar percentage gains in the mid- to high single digits. For the full year 2002, gross profit dollar percentage increases were expected to be in the mid-single digit range, and earnings per share were expected to increase 30% to approximately $1.31 versus 2001 cash EPS, excluding charges, of $1.01.

27.  Defendant Antioco blamed the "unprecedented number of movie titles available for sale at deeply discounted prices", and "this year's DVD gift-giving phenomenon" for the revised guidance. The Company's business was severely hampered by competing stores which sold DVD titles at discounts to Blockbuster's prices. Many stores such as Wal-Mart sell millions of dollars worth of DVD's at prices far below what Blockbuster charges as "loss leaders" intended to draw customers into the store to make further purchases. The Company was financially hurt by the emergence of the saleable DVD as a preferred alternative to the traditional rentable VHS or DVD. Consumers eschewing the rental alternative are hurting Blockbuster's business success.

28.  On January 2, 2003, it was announced that BVHE had filed a $120 million lawsuit against the Company alleging that Blockbuster had failed to make required contract payments of $120 million pursuant to on a revenue-sharing agreement. It was alleged that the Company had improperly deducted "promotional" and "operational" credits and sold off videocassettes earlier in time and in greater number than the agreement permitted.

**Defendants Caused Blockbuster to Issue
Materially False Statements to the Investing Public**

29.  On February 12, 2002, the Defendants caused the Company to disseminate a news release to the investing public, which stated in relevant part:

> Blockbuster Inc. (NYSE: BBI), a leading provider of rentable home entertainment, today announced financial results for the fourth quarter and year ended December 31, 2001. Including previously announced,

7

primarily non-cash charges of approximately $40 million in the fourth quarter and approximately $400 million for the full year, the Company reported a net loss of $4.5 million, or $0.03 per share for the quarter, and a net loss of $240.3 million, or $1.37 per share for the full year. This compares with a net loss of $24.6 million, or $0.14 per share for the fourth quarter of 2000, and a net loss of $75.9 million, or $0.43 per share for the full year 2000, including a non-cash charge of $31.6 million taken in the fourth quarter.

"We closed 2001 with exceptional financial results, achieving record revenues, strong cash flow and enhanced operational profitability while lowering our debt by more than $430 million," said John Antioco, Blockbuster chairman and CEO. "At the same time, we undertook a number of key initiatives to strengthen our core business and drive growth in profitability, including re-merchandising our stores to expand our selection of higher margin DVDs and dedicating more of our sales area to high-growth new game formats and promising new business opportunities. *We remain poised to increase our industry-leading position with a long-term strategic plan that includes driving top-line and gross profit growth, generating efficiencies in operating costs, and growing our movie and games business while leveraging our brand to capitalize on potential new revenue streams.*"

The 2001 charges related primarily to the elimination of approximately 25% of the Company's less-productive VHS tapes and games and changes in amortization as part of a dramatic re-merchandising effort to make room for high-growth, high-margin products like DVD. The 2000 charge related primarily to the impairment of hardware and software generated by the decision to outsource certain components of the Company's website infrastructure. Excluding the charges, net income was $21.5 million, or $0.12 per diluted share for the fourth quarter of 2001, and $11.7 million, or $0.07 per diluted share for the full year of 2001 as compared to a net loss of $5.6 million, or $0.03 per share for the fourth quarter of 2000, and a net loss of $56.9 million, or $0.33 per share for the full year of 2000. Excluding these charges, cash earnings (net income before goodwill amortization, net of tax) were $63.2 million, or $0.35 per diluted share for the quarter and $179.3 million, or $1.01 per diluted share for the full year.

Total revenues for the fourth quarter of $1.36 billion were up 1.3% over the same time last year when year over year quarterly revenues

had increased 12.1% to $1.34 billion. Total revenues for 2001 increased 4.0% to $5.16 billion compared with $4.96 billion last year primarily due to the net addition of 158 company-operated stores and worldwide same store revenue that increased 2.8% for the quarter and 2.5% for the year, driven by strong international results.

*********

Gross profit for the full year was $2.74 billion, including charges of $337.6 million. Excluding the charges, gross profit increased to $3.07 billion for 2001 from $2.92 billion last year, as a result of growth in total revenues and the addition of new stores. *As a percent of revenues, gross profit increased to 59.6% for the year, from 59.0% last year, as a result of growth in higher margin DVD rentals, which were up more than 160% year over year, and fewer purchases under lower margin VHS revenue sharing agreements.* (Emphasis added.)

30. On April 24, 2002, the Individual Defendants caused the Company to announce its first quarter of 2002 results. It was reported by Reuters that Blockbuster "forecast 2002 profits slightly above Wall Street's consensus estimate, driven by sales growth and an increase in higher-margins DVD rentals." "Our first quarter performance speaks to the strength of our business and validates the strategy that we implemented last year focusing on high-growth game and DVD formats," Chief Executive John Antioco said.

31. It was further reported that: "The company said it expects 2002 cash earnings per share to rise at least 20 percent over $1.01 reported for last year. The First Call consensus estimate currently reflects an anticipated 16 percent rise to $1.17." because "Blockbuster caught on quickly to consumers' appetite for the [DVD] format. It has planned to rid itself of about 25 percent of its tape library to make room for the discs, which carry about 10 percent higher margin than videocassettes. The company said it expects DVDs to account for more than half of its rentals by 2003, up from about 30 percent currently."

9

32. The report continued that "[t]he company forecast worldwide sales at stores open at least a year, a key indication of retail performance, will increase in the low to mid-single digit percentage range for the full year. It targeted a double-digit percentage rise in earnings before interest, taxes, depreciation and amortization."

33. The afore-referenced statements were materially false since DVD rentals were not rising as expected, but were falling as more consumers purchased them from other retailers as the selling price of the DVD's declined.

34. On July 24, 2002, the Individual Defendants caused the Company to release the following statement set forth in relevant part:

> DALLAS, July 24, 2002 — Blockbuster Inc. (NYSE: BBI), a leading global provider of in-home movie and game entertainment, today announced financial results for the second quarter ended June 30, 2002. Total revenues for the second quarter increased to $1.27 billion, from $1.23 billion last year, driven by a 3.9% increase in worldwide same store revenues.
>
> "This was another quarter of growth in both free cash flow and profitability," said John Antioco, Blockbuster chairman and CEO. "Our business is performing well with same store revenues up nearly 4 percent, led by a continued strong performance in DVD and growth in games. *Moving forward, we are strategically positioning Blockbuster to become a complete source for movies and games with innovative marketing and merchandising initiatives designed to strengthen our rental proposition while increasing our share of the growing retail market.*"

35. With respect to the third quarter and full year business outlook, the Company reported:

> The following are the Company's current expectations for the third quarter and full year of operations:

> The Company expects the percentage increase in gross profit dollars to be in the mid-single digit range for the third quarter while the percentage increase in worldwide same store revenues is expected to be in the low-single digit range.
>
> For the full year, the percentage increase in gross profit dollars is expected to be in the mid-single digit range, driven by a combination of sales growth and rental margin improvement due to growth in higher margin DVD rentals. Additionally, for the full year, the percentage increase in worldwide same store revenues is expected to be in the low- to mid-single digit range.
>
> For the full year, the Company believes that it will achieve double-digit EBITDA growth, which will result in 2002 EPS growth of at least 20% over 2001 cash. (emphasis added)

36. Between April 30, 2002 and August 1, 2002, various individual defendants sold approximately $23 million of Blockbuster stock.

37. On October 22, 2002, the individual defendants caused the Company to disseminate the following to the investing public:

> BLOCKBUSTER REPORTS THIRD QUARTER RESULTS HIGHLIGHTED BY A 6.9% INCREASE IN WORLDWIDE SAME STORE REVENUES AND STRONG CASH FLOW
>
> Company Reports a 9.6% Increase in Third Quarter Revenues to $1.39 Billion and a 4.9% Increase in Year-to-Date Revenues to $3.98 Billion
>
> Excluding the Impact of Primarily Non-Cash Charges of Approximately $356 Million in 2001:
>
> Gross Profit Increased 5.8% to $801.7 Million for the Third Quarter of 2002 and 3.4% to $2.35 Billion Year-to-Date
>
> Third Quarter 2002 Diluted Earnings Per Share Increased 16.7% to $0.28 Per Diluted Share Compared to Cash Earnings of $0.24 Per Diluted Share for the Same Quarter Last Year

11

> For the First Nine Months of 2002, Diluted Earnings Per Share Before Cumulative Effect of Change in Accounting Principle Climbed 31.8% to $0.87 Per Diluted Share Compared to Cash Earnings of $0.66 Per Diluted Share for the Same Period Last Year

38. On December 18, 2002, the individual defendants disseminated the information set forth above in paragraph 26.

39. Thereafter, Business Week reported in relevant part as follows:

> In November, [Blockbuster] announced plans to devote more store space to selling DVDs. However, the margins on movies it sells are a fraction of those on rentals. . .. Assume, for instance, that Blockbuster pays $15 for a DVD. Renting it 10 times yields a profit of $35 to $40, whereas selling a new DVD, for say, $18, yields a gross profit of only $3.
>
> DVD sales are outpacing rentals for several reasons. Every parent who owns Baby Mozart, a learning title based on classical music, knows that a child will watch the video ad nauseam. In the case of older, classic titles such as Star Wars or Ben Hur, analysts say, many viewers plan to watch them multiple times, which makes buying worthwhile.
>
> REVENGE OF THE STUDIOS. There's also convenience to consider. "On a rainy night, you can go to your own library," says [analyst] Weichselbaum. Though DVDs may be usurped by another home-video technology -- perhaps by video on demand -- they're now the highest-quality product on the market because of their sharper picture and the additional material they contain, such as commentary by directors.
>
> A change in the way Blockbuster and movie studios share revenues is also contributing to the DVD boom. Blockbuster sends a percentage of its VHS rental income to the studios. But thanks to a different deal it insisted on for DVDs, Blockbuster buys the disks outright from studios and keeps all the rental income.
>
> Studios have responded by selling DVD versions of films at the same time that they make them available for rent -- and pricing them more aggressively than they did when it was in their best interest to get consumers to rent, not buy. Stir into the mix a few huge retailers that

> are willing to use the disks as loss leaders for products such as DVD players, and suddenly the average movie buff sees a reason to switch, says Weichselbaum.
>
> "MASSIVE RESTRUCTURING"? At the moment, no end is in sight to the fierce competition in the DVD marketplace, which may continue to drive down prices. For instance, Walmart.com, the discounting giant's online division, says it's willing to sell top movie releases at a loss to attract customers who might buy something else.
>
> That raises the question: What will happen to the movie-rental market when DVDs start going for as little as $10? Weichselbaum figures that as many as two-thirds of the 52 million card-carrying Blockbuster customers might never rent again. If that happens, he adds, the outfit might find itself owning twice as many stores as it needs -- and be "headed for a massive restructuring."

40. As a result of the wrongdoing by defendants Blockbuster faces serious liability as a result of the securities class action fraud litigation commenced against it, for which the individual defendants are responsible.

## DERIVATIVE AND DEMAND EXCUSED ALLEGATIONS

41. Plaintiff brings this action derivatively in the right and for the benefit of the Company to redress injuries suffered and to be suffered by the Company as a result of the breaches of fiduciary duty and other violations of law by the defendants.

42. Plaintiff will adequately and fairly represent the interests of the Company and its shareholders in enforcing and prosecuting its rights.

43. As a result of the facts set forth herein, plaintiff has not made any demand on the Company's Board of Directors to institute this action. Such demand would be a futile and useless act because the Board is incapable of making an independent and disinterested decision to institute

13

and vigorously prosecute this action.

44. Viacom has majority voting control of Blockbuster, and its representatives on the Blockbuster Board constitute a majority of the Board: Defendant Bressler is an Executive Vice-President and Chief financial Officer of Viacom; Defendant Dauman is a director of Viacom, and is a former executive officer of that company; Defendant Karmazin is President and Chief Operating Officer of Viacom; Defendant Redstone is Chairman of the Viacom Board.

45. Reasonable doubt as to their independence exists with respect to whether these Blockbuster directors could fairly make the determination to bring suit on behalf of Blockbuster, since their loyalties lie with Viacom and they would never do anything to even potentially subject Viacom to liability which might arise in the litigation of the derivative action in favor of Blockbuster. Indeed, Viacom as majority shareholder of Blockbuster may share responsibility for the wrongdoing which occurred herein, and Viacom could be subject to ruinous liability to Blockbuster as a result. These Blockbuster directors owe their primary allegiance to Viacom. Accordingly these Blockbuster directors would *never* vote to subject Viacom to any liability, regardless of the merits of the action.

46. Reasonable doubt as the their independence also exists with respect to defendants Dauman, Bressler, Karmazin, Redstone and Antioco, since securities fraud litigation has been instituted against the Company and some or all of these defendants, and they are simply not in a disinterested position to recommend that litigation be commenced against them on behalf of the Company seeking to prove that they committed fraud. In addition, defendant Antioco cannot be deemed independent, since he sold shares during the Relevant Period, enriching himself though the violation of his fiduciary duties to the Company.

47.  The Company's directors' and officers' liability insurance coverage has an "insured vs. insured" exclusion. Thus, if the Individual Defendants caused the Company to sue its officers and directors for the liability asserted in this case, they would not be insured for that liability. They will not do this to themselves. The Company's officers' and directors' liability insurance was purchased and paid for with corporate funds for the protection of the corporation. This derivative action does not trigger the "insured vs. insured" exclusion, and therefore only this derivative action can obtain a recovery from the Company's officers' and directors' insurance for the benefit of the corporation.

48.  Even if insurance coverage is available, it is likely to be far exceeded by the possible damages that the Individual Directors could face, thus preventing them from the ability to exercise independent business judgment as to whether this suit should be brought against all defendants named herein.

## COUNT I

(Against Individual Defendants Dauman, Bressler, Karmazin,
Redstone and Antioco for Violation of
Section 10(b) of the Exchange Act and Rule 10b-5)

49.  Plaintiff realleges and incorporates by reference each and every allegation contained above.

50.  This claim is brought under Section 10(b) of the Exchange Act and Rule 10b-5 against these individual defendants for fraud as a result of the illegal scheme to mislead the public Blockbuster shareholders and inflate the market price for Blockbuster stock.

51.  The Individual Defendants, as directors and officers of the Company had an obligation not to defraud the investing public by the issuance of false statements concerning the

business and prospects of Blockbuster, and had the obligation not to cause Blockbuster to do so.

52. These individual defendants breached that duty by causing Blockbuster to engage in a fraudulent scheme which inflated the selling price of Blockbuster stock. When the wrongful conduct was revealed, the price of Blockbuster stock materially declined, and Blockbuster was sued for securities fraud.

53. As a result of their wrongful conduct, these defendants violated Section 10(b) of the Exchange Act and Rule 10b-5, and have caused Blockbuster to so violate Section 10(b) of the Exchange Act and Rule 10b-5.

54. As a result of their wrongdoing, these individual defendants are liable to Blockbuster for the violations of the securities law, the exact amount of the damage to be proved at trial.

## COUNT II

(Against Individual Defendants Dauman, Bressler, Karmazin, Redstone and Antioco For Breach of Fiduciary Duty)

55. Plaintiff incorporates by reference all preceding and subsequent paragraphs as if set forth fully herein.

56. As alleged in detail herein, each of the Individual Defendants had a duty to ensure that Blockbuster disseminated accurate information to the market.

57. Each of the individual defendants violated the fiduciary duties of due care and loyalty by causing or allowing the Company to disseminate to the market materially misleading and inaccurate information through public statements, and making projections for future financial results which lacked a reasonable basis.

58. As a direct and proximate result of the Individual Defendants' foregoing breaches of fiduciary duties, the Company has suffered enormous damages, the amount of which to be proved at trial.

59. These defendants are liable for damages for the harm caused to the Company.

## COUNT III

(Against Individual Defendants Dean W. Wilson, Nigel Travis, Jim Notarnicola, Edward B. Stead, Mike Roemer Nick Shepherd, Chris Wyatt, and Larry Zine, and John F. Antioco for Breach of Fiduciary Duty)

60. Plaintiff incorporates by reference all preceding and subsequent paragraphs as if set forth fully herein.

61. As alleged in detail herein, each of the Individual Defendants had a duty to ensure that Blockbuster disseminated accurate information to the market.

62. Each of the Individual Defendants also had the obligation not to trade their own shares having adverse inside information not known to the investing public.

63. Each of these individual defendants was in possession of adverse inside information, and yet engaged in material sales of stock during the Relevant Period.

64. This conduct constituted a breach of these directors' and officers' fiduciary duty of loyalty owed to Blockbuster

65. As a result of these defendants breaches of fiduciary duty, they must pay over to the Company all proceeds derived from the illicit sales of their own shares during the Relevant Period.

## JURY TRIAL DEMAND

Plaintiff respectfully demands a trial by jury.

WHEREFORE, plaintiff demands judgment as follows:

A.  Against the individual defendants for violations of Section 10(b) and Rule 10b-5 on behalf of the Company for damages caused to the Company;

B.  Against the individual defendants and in favor of the Company for the damages sustained by the Company as a result of the Individual Defendants' breaches of fiduciary duties;

C.  Against the individual defendants and in favor of the Company for the proceeds derived from the illicit insider trading by Company officers and directors in violation of their fiduciary duties;

D.  Awarding to plaintiff the costs and disbursements of the action, including reasonable attorneys' fees, accountants' and experts' fees, costs, and expenses; and

E.  Granting such other and further relief as the Court deems just and proper.

DATED:   February 14, 2003

                                        Respectfully submitted,

                                        PULS, TAYLOR & WOODSON, L.L.P.

                                        _____
                                        W. Kelly Puls
                                        State Bar No. 16393350
                                        Brant C. Martin
                                        State Bar No. 24002529
                                        2600 Airport Freeway
                                        Fort Worth, Texas 76111
                                        Telephone:   (817) 338-1717
                                        Facsimile:   (817) 338-1416

        and

        Laurence D. Paskowitz
        **PASKOWITZ & ASSOCIATES**
        271 Madison Avenue–20th Floor
        New York, NY 10016
        (212) 695-0969
        (212) 695-2306 (Fax)

        Counsel for Plaintiff

OF COUNSEL:
ROY L. JACOBS, ESQ.
292 Madison Avenue
15th Floor
New York, NY 10017
(646) 742-9860

## VERIFICATION OF PLAINTIFF

I, Ronald Young, under pain and penalty of perjury, do hereby certify that I have read the foregoing shareholder's derivative complaint on behalf of Blockbuster, and that its allegations are true and correct, to the best of my knowledge, information and belief.

Dated: February 13, 2003

_____
Ronald Young